Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S. App. D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 8, 2004 Decided May 31, 2005

No. 04-5057

AMERICAN FEDERATION OF LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS,
APPELLANT

v.

ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02464)

———

*Leon Dayan* argued the cause for appellant. With him on the briefs were *Robert M. Weinberg*, *Laurence Gold*, *Jonathan P. Hiatt*, *Deborah Greenfield*, and *James B. Coppess*.

*Jeffrey Clair*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, *Michael J. Singer*, Attorney, *Nathaniel I. Spiller*,

Acting Associate Solicitor, U.S. Department of Labor, *Andrew D. Auerbach*, Counsel, and *William J. Stone*, Senior Attorney.

*Raymond J. LaJeunesse, Jr.* and *Nathan Paul Mehrens* were on the brief for *amici curiae* National Right to Work Legal Defense Foundation, Inc., et al. in support of appellee.

Before: EDWARDS, ROGERS and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* ROBERTS.

ROGERS, *Circuit Judge*: The American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") challenges the Secretary of Labor's interpretation of her authority under sections 201(b) and 208 of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 431(b), 438 (2000), in promulgating the Labor Organization Annual Financial Reports ("final rule"), 68 Fed. Reg. 58,374 (Oct. 9, 2003) (to be codified at 29 C.F.R. pts. 403, 408). Appealing the judgment of the district court upholding the final rule, the AFL-CIO contends that the Secretary exceeded her delegated authority in two respects: First, by requiring labor organizations to include item-by-item listings of ordinary receipts and disbursements in revised Form LM-2, the Secretary ignored a limitation on her authority in section 201(b). Second, by imposing a general trust reporting requirement in new Form T-1 that is unrelated to preventing circumvention or evasion of reporting requirements under LMRDA Title II, the Secretary ignored a limitation on her authority in section 208.

Neither the plain language of section 201(b), its legislative

history, nor prior administrative interpretation resolves the ambiguity in section 201(b) regarding the level of detail that the Secretary may require labor organizations to include in their annual financial reports. In light of the Secretary's explanation for the changes to Form LM-2 in order to fulfill the purpose of section 201(b), we hold that the Secretary's promulgation of revised Form LM-2 is a reasonable application of her authority under section 201(b). We further hold that while the Secretary has authority under section 208 to require labor organizations to file reports on certain trusts where necessary to prevent circumvention or evasion of reporting requirements under LMRDA Title II, the Secretary's promulgation of new Form T-1 has exceeded her authority by requiring general trust reporting. Accordingly, we affirm the judgment of the district court in part, reverse in part, and we vacate the provisions of the final rule relating to Form T-1.

## I.

Title II of the LMRDA, entitled "Reporting By Labor Organizations, Officers and Employees of Labor Organizations, and Employers," requires labor organizations to report on a number of activities. Section 201(b) of Title II requires each covered labor organization ("union") to file with the Secretary an annual financial report "in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year" – "all in such categories as the Secretary may prescribe."[1] 29 U.S.C. § 431(b). Subparts (1),

---

[1] Section 201(b) provides:

> Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail as may be necessary accurately to disclose its financial condition and operations

(2), and (6) require reports of (1) "assets and liabilities," (2) "receipts" and their "sources," and (6) "other disbursements" and their "purposes." *Id*. § 431(b)(1), (2), (6). Subparts (3), (4), and (5) require more detailed reporting, subject to threshold dollar amounts, of specific types of disbursements – including salary and related payments to union officers and employees, loans to union insiders, and loans to business enterprises. *Id.* § 431(b)(3)-(5). The financial report, upon filing with the Secretary, becomes public information. *Id.* § 435. Section 208 of Title II authorizes the Secretary to prescribe the "form and

---

for its preceding fiscal year–

(1) assets and liabilities at the beginning and end of the fiscal year;

(2) receipts of any kind and the sources thereof;

(3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;

(4) direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purpose, security, if any, and arrangements for repayment;

(5) direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and

(6) other disbursements made by it including the purposes thereof;

all in such categories as the Secretary may prescribe.

29 U.S.C. § 431(b).

publication" of the various reports required under Title II.[2]  *Id.*
§ 438.

In promulgating the implementing regulations for section
201(b) in 1960, the Secretary of Labor required unions with
gross annual receipts equal to or greater than a certain dollar
threshold to file an annual financial report on Department of
Labor Form LM-2.  *See* 25 Fed. Reg. 433 (Jan. 20, 1960)
(codified at 29 C.F.R. pt. 403).  Unions with lower receipts filed
reports on simplified Forms LM-3 or LM-4.  *Id.* at 433-34.
Form LM-2 called for reporting of assets and liabilities and
receipts and general disbursements in aggregate amounts.  Form
LM-2 required unions to itemize their disbursements only with
respect to the transactions specified in subparts (3), (4), and (5)
of section 201(b).  The 1960 regulations required unions to
retain, for a five-year period, vouchers, receipts, and other
underlying documentation in sufficient detail to permit these
reports to be "verified, explained or clarified, and checked for
accuracy and completeness."  *Id.* at 434; *see also* 29 U.S.C. §
436.  With the exception of the dollar filing threshold, these
reporting requirements remained substantially unchanged for
more than four decades.  *See* 57 Fed. Reg. 14,244 (Apr. 17,
1992)**.**  The Secretary periodically increased the filing threshold
for the Form LM-2 report so that, by 1994, only unions with

---

[2]  Section 208 provides that:

> The Secretary shall have authority to issue . . . rules and
> regulations prescribing the form and publication of reports
> required to be filed under this subchapter and such other
> reasonable rules and regulations . . . as he may find
> necessary to prevent the circumvention or evasion of such
> reporting requirements.

29 U.S.C. § 438.

annual receipts of $200,000 or more were required to complete this longer form. *See* 67 Fed. Reg. 79,280, 79,293 (Dec. 27, 2002).

On October 9, 2003, the Secretary promulgated the final rule now challenged, calling for several significant changes to the financial reporting requirements under section 201(b). The final rule amended Form LM-2 to require unions to itemize their general receipts and disbursements. Unions must identify, in six supporting schedules, individual receipts and (non-salary) disbursements made to support a particular union function of $5,000 or more, and specify the name, address, purpose, date, and amount associated with each transaction. 68 Fed. Reg. at 58,429-30. In addition to reporting such "major" transactions, *see id.* at 58,388-89, each union officer and employee must provide a functional accounting, estimating the portion of work time spent on the corresponding activities. *Id.* at 58,429. Unions also must identify the vendors and other entities that received union receipts and disbursements of $5,000 or more during the fiscal year. *Id.* Unions must further itemize all accounts receivable and payable of $5,000 or more at the end of the fiscal year and include an "aging" schedule for each item showing the amount of money owed to or by the union that is either 90 to 180 days or more than 180 days past due. *Id.* at 58,429, 58,452-53, 58,485, 58,491. The final rule raised the filing threshold to $250,000. *Id.* at 58,383. Each union filing a Form LM-2 report must also file a separate Form T-1 report on significant trusts in which the labor organization is interested, *id.* at 58,477, disclosing the trust's assets, liabilities, receipts, and disbursements, as well as certain asset acquisitions or dispositions, liability liquidations, and loans extended below market rate or written off. *Id.* at 58,518, 58,531.

The AFL-CIO sued the Secretary, seeking injunctive and declaratory relief that the final rule is unlawful under the

Administrative Procedure Act, 5 U.S.C. § 706(2)(C) (2000). In relevant part, the complaint alleged that both the itemization requirement in the revised Form LM-2 and the trust reporting requirement in Form T-1 were in excess of the Secretary's authority under the LMRDA. Because the final rule would become effective in a matter of weeks, the complaint also alleged that its effective date was unworkable. The district court denied the AFL-CIO relief, except with respect to the implementation date, which the court stayed until the later of July 1, 2004, or ninety days after the Secretary makes available a fully tested electronic reporting software. The AFL-CIO appeals, and our review of the judgment denying relief is *de novo. Gas Appliance Mfrs. Ass'n v. Dep't of Energy,* 998 F.2d 1041, 1045 (D.C. Cir. 1993).

## II.

The AFL-CIO does not contest that Congress has delegated authority to the Secretary to promulgate rules to enforce section 201(b). Rather it challenges the Secretary's interpretation of her authority to require itemization in the revised Form LM-2 under section 201(b) for subparts (1) "assets and liabilities," (2) "receipts," and (6) "other disbursements." We therefore proceed under the familiar two-step approach of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), to determine whether the Secretary's interpretation is entitled to deference. "[E]mploying traditional tools of statutory construction" the court must determine whether "Congress has an intention on the precise question at issue," and if so "that intention is the law and must be given effect." *Id.* at 843 n. 9 ("Step 1"). If Congress has not directly spoken to the issue, the court must defer to the Secretary's interpretation of the statute if it is reasonable and not "manifestly contrary to the statute." *Id.* at 844-45 ("Step 2").

The AFL-CIO contends that the issue of itemization is

resolved under *Chevron* Step 1 because the accounting terms "financial condition" and "operations" in section 201(b) have a generally understood meaning in the accounting field, signaling Congress's intent to require an annual financial report similar to those filed by corporations and nonprofits generally, and thus to limit the Secretary's authority to requiring aggregated financial information in informative categories relevant to the unions that are required to report the information. While acknowledging that the operative statutory language of section 201(b) requires a financial report containing information about assets, liabilities, receipts, and disbursements "in such detail as may be necessary accurately to disclose [a union's] financial condition and operations," the AFL-CIO contends that the statute sets "a concrete standard," and, contrary to the Secretary's view, does not provide that the report shall be "*at a minimum,* in such detail as may be necessary" or "*at least* in such detail as may be necessary" to disclose financial condition and operations. Br. of Appellant at 20. In the AFL-CIO's view, section 201(b) vests a limited authority in the Secretary to develop an annual report modeled on a corporate balance sheet and income statement, and to prescribe categories relevant to labor organizations for reporting that information.

The Secretary, in response, maintains that the AFL-CIO's textual argument reads the statutory terms "financial condition" and "operations" in section 201(b) too narrowly in light of the broader purposes of the LMRDA disclosure provisions. If the term "financial condition" referred only to a statement of assets and liabilities, and "operations" to a statement of disbursements and receipts, the Secretary maintains there would have been no need for Congress to have included the phrase "in such detail as may be necessary accurately to disclose" this information or subparts 201(b)(1), (2), and (6) regarding "assets and liabilities," "receipts," and "other disbursements." The Secretary interprets her rulemaking authority under section 208 to provide simplified

reporting requirements as necessarily presupposing general authority to prescribe reporting detail in the first instance and thus vesting "a broad legislative authority to determine the appropriate form and the content of a required financial report." Br. of Appellee at 28-29.

While the AFL-CIO may be correct that the terms "financial condition" and "operations" have a generally understood meaning, in enacting section 201(b) Congress did not adopt the precise terms of art – "statement of financial condition" and "statement of operations" that connote the typical corporate income statement and balance sheet, s*ee* American Institute of Certified Public Accountants, *Accounting Trends & Techniques in Published Corporate Annual Reports* 6-7 (11th ed. 1957) – nor did it expressly provide, for example, that unions' reports should be made "in accordance with generally accepted accounting principles," *cf.* 12 U.S.C. § 1441a(k)(4)(B)(i) (2004). These terms of art do not appear in the statutory text of the LMRDA, and while there are references to "statements" in the legislative history, specifically to "a *statement* of assets and liabilities and a *statement* of receipts and expenditures," S. Rep. No. 86-187, at 8-9 (emphasis added), the word "statements" itself does not define the required level of detail nor necessarily preclude itemized reporting.

The AFL-CIO also purports to find support for its *Chevron* Step 1 position in legislative history regarding the relationship between the reporting requirements of the LMRDA and reporting requirements of its predecessor, the Labor Management Relations Act of 1947 ("Taft-Hartley Act"), ch. 120, § 9(f), 61 Stat. 136, 145 (1947). It maintains that section 201(b)'s reporting requirements were intended to mirror the requirements of section 9(f) of the Taft-Hartley Act, with three additional requirements, in which specific detail was required, set forth in subparts (3), (4) and (5). It points to legislative history which

states, "The information required to be filed by unions under this title is similar to that required by section 9(f) of the [Taft-Hartley] Act." S. Rep. No. 86-187, at 8 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2325; *see* H.R. Rep. No. 86-1147 (Conference), at 7, 31-32 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2503, 2504. Section 9(f) of the Taft-Hartley Act required a union that wished to use the facilities of the National Labor Relations Board to file two reports, one addressing subject matters similar to those listed in LMRDA section 201(a), and the other reporting all receipts and their sources, total assets and liabilities, and disbursements and their purposes. 61 Stat. at 145. The LMRDA Senate Report stated, "The information to be reported under the committee bill comprehends all the information required to be reported under present law. The committee bill, in addition, requires certain information to be reported that does not have to be specifically detailed under present law," referencing the information required under the new provisions, sections 201(b)(3), (4), (5), and 201(a). S. Rep. No. 86-187, at 36. The House Report called for repeal of section 9(f) of the Taft-Hartley Act, in order to eliminate the filing of duplicate reports, stating that its "bill will require labor organizations to file substantially the same information with the Secretary of Labor," H.R. Rep. No. 86-741, at 33 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2424, 2456.

From this legislative history the AFL-CIO draws the conclusion that the "present law" reference includes not only the text of section 9(f) but also the implementing regulations promulgated by the Secretary of Labor in 1948, which did not require itemization and called only for aggregated reporting of receipts and their sources, assets and liabilities, and disbursements. *See* Registration Form for Labor Organizations, 22 Labor Relations Reference Manual 3002 (1948). For further support of its position that in enacting the LMRDA Congress intended unions to file reports similar to the aggregate income

statement/balance sheet reporting then required, the AFL-CIO points to several statements in the legislative history of the Taft-Hartley Act indicating that Congress contemplated a particular kind of financial reporting by unions: (1) statements by Senator Taft, a principal sponsor of the Taft-Hartley Act, that "financial reports . . . are made in many unions today," and explaining that under the Taft-Hartley bill "the union must file statements as corporations have had to file them," *see* 2 National Labor Relations Board, Legislative History of the Labor Management Relations Act 1000, 1014, 1654 (1947); and (2) a statement in the Taft-Hartley minority report by three Senators that "[v]irtually all of the international unions of both the CIO and the A.F. of L. already furnish regular financial reports and accounts of their activities," 1 National Labor Relations Board, Legislative History of the Labor Management Relations Act 484 (1947).

Whatever persuasive force this legislative history of the Taft-Hartley Act may have in devining congressional intent in enacting the LMRDA, the AFL-CIO's "present law" contention fails because the revised 1957 Taft-Hartley regulations in effect when Congress enacted the LMRDA required more detailed reporting by unions, including certain itemized disclosures of receipts and disbursements. *See* 22 Fed. Reg. 4,158, 4,158-60 (June 13, 1957). The 1957 regulations included several itemized reporting schedules: Schedule A instructed unions to "[i]temize any receipts from sale of assets," and other schedules addressing receipts from other sources and other disbursements required unions to "[s]eparately identify each individual item representing one or more transactions during the year with an individual or organization if the total amount of such individual item is in excess of 25 percent of the schedule total." *Id.* at 4,160. The isolated statements in the legislative history relied on by the AFL-CIO do not contradict this reality.

Likewise, the AFL-CIO's structural arguments do not demonstrate a clear congressional intent. First, the AFL-CIO would contrast the language in subparts (3), (4), and (5) of section 201(b), in which Congress required specific details, with that in subparts (1), (2), and (6), in which Congress did not, to suggest that Congress intended that unions would report assets, liabilities, receipts, and other disbursements only in aggregate categories. However, the general provision providing that the reports must contain "the following information in such detail as may be necessary accurately to disclose" reasonably may be interpreted to apply equally to the six specific subparts, including assets and liabilities, receipts, and other disbursements. That Congress required greater detail in subparts (3), (4), and (5) does not necessarily mean that it intended to limit detail in reporting under subparts (1), (2), and (6), particularly when it also granted the Secretary discretionary authority to prescribe the required "form" and "categories" for reporting. 29 U.S.C. §§ 431(c). Section 208, in turn, by limiting the Secretary's regulatory authority to rules "necessary to prevent the circumvention or evasion" of reporting requirements under LMRDA Title II, also leaves undefined the level of detail that may be required. *Id*. § 438.

Second, the AFL-CIO contends that the Secretary's interpretation of subsection 201(b) puts that provision in an irreconcilable tension with subsection 201(c). Subsection 201(c) provides that any union member "for just cause" may examine any books, records, and accounts necessary to verify the union's annual financial report. 29 U.S.C. § 431(c). In the AFL-CIO's view, requiring unions to reveal to the general public individual item-by-item disbursement and receipt information that Congress permitted unions to protect even from union members through subsection 201(c)'s "just cause" provision renders that protection meaningless. However, as the Secretary points out, there is no necessary inconsistency between the itemization required by the

Form LM-2 under the final rule and subsection 201(c) because subsection 201(c) simply requires disclosure of data underlying subsection 201(b) reports, and additional detail in the subsection 201(b) reports would facilitate a union member's right to probe further pursuant to subsection 201(c).

Given the ambiguity in the statutory text and structure, and the lack of clear intent in the legislative history regarding the level of public financial reporting detail that the Secretary may require, we agree with the Secretary that our inquiry should proceed under *Chevron* Step 2. Under *Chevron* Step 2, courts owe deference to an agency's interpretation of a statute it is entrusted to administer. *Chevron,* 467 U.S. at 844. At the same time, when statutory language is ambiguous it is not a foregone conclusion that an agency's interpretation is a reasonable one to which the court must defer. *See Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 480 (2001); *Associated Gas Distribs. v. FERC,* 899 F.2d 1250, 1253 (D.C. Cir. 1990). Under *Chevron* Step 2, "the question for the court is whether the agency's interpretation is based on a permissible construction of the statute," *Chevron,* 467 U.S. at 843, in light of its "language, structure, and purpose," *Int'l Alliance of Theatrical & Stage Employees v. NLRB,* 334 F.3d 27, 34 n.3 (D.C. Cir. 2003) (citations omitted).

The Secretary contends that deference principles apply with greater force here because Congress has empowered her to act to prevent circumvention or evasion of the LMRDA. Citing *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973), the Secretary maintains that absent an abuse of discretion or an express statutory limitation on the broad delegation of authority to the Secretary by Congress, the AFL-CIO cannot show that the Secretary acted beyond her authority in promulgating the final rule. However, the court is obligated not only to construe the statute as a whole but to give meaning to

each word of the statute. *See Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 489 n.13 (2004); *Asiana Airlines v. FAA,* 134 F.3d 393, 398 (D.C. Cir. 1998). The language of the LMRDA is more limited than that addressed in *Mourning.* Sections 201(b) and 208 authorize the Secretary to prescribe detail "necessary accurately to disclose [a union's] financial condition and operations" and "necessary to prevent the circumvention or evasion of such reporting requirements," respectively, rather than more generally to act as is "necessary to carry out the purposes" or "provisions" of a statute, as discussed in *Mourning. Cf. Mourning,* 411 U.S. at 369-70. Therefore, under *Chevro*n Step 2, the court's deference to the Secretary is still limited by the particular language of sections 201(b) and 208. Even when Congress has stated that the agency may do what is "necessary," *see AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 387-92 (1999); *GTE Serv. Corp. v. FCC,* 205 F.3d 416, 422-23 (D.C. Cir. 2000), whatever ambiguity may exist cannot render nugatory restrictions that Congress has imposed. *Cf. Am. Trucking Ass'ns*, 531 U.S. at 484.

In promulgating the final rule the Secretary justified the revised Form LM-2 reporting requirements as follows:

> The forms no longer serve their underlying purpose because they fail to provide union members with sufficient information to reasonably *disclose to them 'the financial condition and operation[s]'* of labor organizations . . . . [I]t is impossible for union members to evaluate in any meaningful way the operations or management of their unions when the financial disclosure reports filed . . . simply report large expenditures for broad, general categories. The large dollar amount and vague description of such entries make it essentially impossible for anyone to determine with any degree of specificity what union operations

their dues are spent on, without which the purposes of the LMRDA are not met.

68 Fed. Reg. at 58,420 (emphasis added). Responding to arguments that she lacked authority to require itemization, the Secretary stated that the financial reporting requirements under section 201(b) only set minimum standards because she may require unions "to report every receipt and disbursement in any amount." *Id.* at 58,376. But, as the quotation from the preamble indicates, the Secretary recognizes the limitation on her authority to require greater detail only as "necessary accurately to disclose [a union's] financial condition and operations." 29 U.S.C. § 431(b). The final rule limits the disclosures on Form LM-2 to major transactions. To the extent the Secretary asserts she has discretion over the "content" of a financial report, Br. of Appellee at 29, this would be true only to the extent that she means the authority to determine categories of data and level of detail because, as the AFL-CIO points out, Congress intentionally deleted the word "content" from an earlier version of section 208. *Compare* 1 National Labor Relations Board, Legislative History of the Labor-Management Reporting and Disclosure Act 44 (1959) (text of S. 505), *with* 29 U.S.C. § 431(b).

In promulgating the revised Form LM-2, the Secretary explained that the final rule promotes the two purposes of union reporting: "to fully inform union members" about their union's "financial condition and operations" and "to deter union officials and employees" from misusing union funds. 68 Fed. Reg. at 58,377. The Secretary reasoned that under current reporting requirements, "[t]he large dollar amount and vague description of . . . entries make it essentially impossible for members to determine whether or not their dues were spent appropriately, which is precisely the reason that the statute requires reporting." 67 Fed. Reg. at 79,281-82. More detailed reporting would

"provid[e] union members with useful data that will enable them to be responsible and effective participants in the democratic governance of their unions." *Id.* at 79,280-81. The AFL-CIO has pointed to nothing in the contemporary understanding of the LMRDA or its legislative history to suggest that the aggregate reporting in the Form LM-2 required by the Secretaries, albeit for four decades, represented the full exercise of the Secretary's authority. *See* 68 Fed. Reg. at 58,376-77. Rather, the "present law" analysis, which the AFL-CIO contends informed Congress's intent with regard to the level of detail to be required under section 201(b), supports the Secretary's view that the Taft-Hartley Act afforded the Secretary authority that encompasses requiring itemized accounting of major transactions. Although Congress intended to carry out its prophylactic purposes through a multi-pronged approach, including reporting, investigatory, and criminal provisions, *see* 29 U.S.C. §§ 432, 433, 453, 436, 439, 521; *see United States v. Budzanoski,* 462 F.2d 443, 449-50, 452 (3d Cir. 1972); *Int'l Bhd. of Teamsters v. Wirtz,* 346 F.2d 827, 831 (D.C. Cir. 1965); *see also Mallick v. Int'l Bhd. of Elec. Workers,* 749 F.2d 771, 780 (D.C. Cir. 1984) (quoting H.R. Rep. No. 86-741, at 7), it declined to specify what the balance should be among these approaches, *see Chevron*, 467 U.S. at 865, and the Secretary could reasonably conclude that "[p]roviding additional detail on Form LM-2 . . . is necessary to give union members an accurate picture of their labor organization's financial condition and operations," 68 Fed. Reg. at 58,420.

In sum, section 201(b) authorizes the Secretary to require certain information "in such detail" "in such categories," but only for the purpose of "accurately . . . disclos[ing] [a union's] financial conditions and operations." 29 U.S.C. § 431(b). The Secretary's promulgation of revised Form LM-2 is a reasonable application of this authority. Accordingly, we hold that the Secretary's revision of Form LM-2 is permissible and not

"manifestly contrary to the statute." *Chevron*, 467 U.S. at 844-45.

**III.**

The final rule also requires unions with annual receipts of $250,000 or more to file a report on Department of Labor Form T-1 regarding any "significant trust" "in which the labor organization is interested." 68 Fed. Reg. at 58,477. The LMRDA defines a "trust in which the labor organization is interested" as one that (1) was either "created or established by a labor organization, or [where] one or more of the trustees or . . . members of the governing body . . . is selected or appointed by a labor organization," and (2) "a primary purpose of which is to provide benefits for the members of such labor organizations or their beneficiaries." 29 U.S.C. § 402(*l*). The final rule defines a "significant trust" as one having annual receipts of $250,000 or more during its most recent fiscal year, and for which the union's financial contribution to the trust, or the contribution made on behalf of the union or as a result of a negotiated agreement to which the union is a party, is $10,000 or more annually. 68 Fed. Reg. at 58,478. Form T-1 requires a report on the financial condition and operations of such union-related trusts, including "the total value of all the trust assets," "liabilities," "receipts," and "disbursements," and it requires itemization of receipts and disbursements of $10,000 or more, similar to the revised Form LM-2 requirement. *See* 68 Fed. Reg. at 58,531-32. A union is excused from filing Form T-1 where the trust has made a similar financial disclosure under other laws, such as the Internal Revenue Code or the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1023, 1024(a), 1030 (2000), or in an independent audit, 68 Fed. Reg. at 58,478.

There is no serious dispute over whether Congress delegated authority to the Secretary to promulgate rules to enforce section 208. Indeed, section 208 provides that "[t]he Secretary *shall*

*have authority* to issue, amend, and rescind . . . such . . . reasonable rules and regulations (including rules prescribing reports concerning trusts in which a [union] is interested) as [s]he may find necessary to prevent the circumvention or evasion of [Title II's] reporting requirements." 29 U.S.C. § 438 (emphasis added). Thus, the question presented by the AFL-CIO's contention that the Secretary lacks authority to require general trust reporting is whether Form T-1 comports with the statutory requirements that the Secretary "find [the rule] necessary to prevent" evasion of LMRDA Title II reporting requirements. *Id.* As the Secretary suggests, this question is properly resolved under *Chevron* Step 2.

Under section 208, the Secretary may require reporting of union-related trusts where a two-part nexus is met: A union must have an interest in the trust as defined in 29 U.S.C. § 402(*l*), and the required reporting must be "necessary" only for the purpose of "prevent[ing] the circumvention or evasion of [union] reporting requirements" under LMRDA Title II, *id.* § 438. Given the ambiguity inherent in the word "necessary," the question remains whether, under *Chevron* Step 2, the Secretary's interpretation of what is "necessary," as embodied in Form T-1, is limited to preventing such circumvention or evasion, and thus is a reasonable application of her authority, and therefore is permissible and entitled to deference. *See Chevron,* 467 U.S. at 844-45. The AFL-CIO contends that the Secretary's interpretation is not permitted, contrasting the more restrictive language in section 208 with broader rulemaking authority, such as section 30 of the Securities and Exchange Act, 15 U.S.C.§ 78dd (2000), and in *Mourning,* discussed *supra* Part II. Under section 208, the AFL-CIO maintains, the Secretary must determine that certain transactions are being rendered unreportable by reason of the fact they are being carried out by a trust in which a union is interested, and for those trusts the Secretary is empowered to prescribe reports concerning such

trusts that disclose affected transactions. We conclude that although the Secretary has identified circumstances where union reporting requirements under Title II may be circumvented or evaded, Form T-1 goes further to require general trust reporting, and thus it is not a reasonable interpretation of her authority under section 208.

The Secretary correctly points out that the statutory definition of "trusts in which a union has an interest," 29 U.S.C. § 402(*l*), is sufficiently broad to encompass trusts that are neither financed nor controlled by unions. Its terms do not dictate a narrow conception of union financial operations, such that, as the AFL-CIO maintains, Taft-Hartley employee benefit plans funded by employer rather than union contributions to an entity legally separate from the union, whose funds are ordinarily disbursed to third parties, would be beyond the reach of section 208. For such trusts, the union has used its bargaining power to establish the trust, to define the purposes for which funds may be used, to appoint union representatives to the governing board in a number equal to management representatives, and to obligate the employer to direct funds to the trust's account. *See id.* § 186 (c) (5) (A) & (B). As the Secretary explained in proposing the final rule:

> Since the money an employer contributes to such a "trust" for union members' benefit might otherwise have been paid directly to the workers in the form of increased wages and benefits, the members on whose behalf the financial transaction was negotiated have a right to know what funds were contributed, how the money is managed and how it is being spent.

67 Fed. Reg. at 79,283.

In "find[ing] necessary" the Form T-1 requirements, the

Secretary identified the types of union transactions rendered unreportable by reason of the fact that a union has made a direct or indirect contribution to a trust in which a union is interested. In promulgating proposed Form T-1, the Secretary illustrated the need for additional reporting on organizations that are not wholly owned by unions by pointing to examples in which union members could not obtain "detailed, reliable information on significant trusts' financial operations." 67 Fed Reg. at 79,283. The first example involved the use of joint training funds to host extravagant parties for trustees and to pay union officials supplementary salaries. *Id.* In a second example, twenty-nine local unions made monthly contributions of $62,000 each to a statewide strike fund that went unreported because no single union wholly owned the fund. *Id.* The third example also illustrated unreported union financial activity that involved a building fund established by local union officials and financed in part by union members' pension funds. *Id*. Lastly, the Secretary pointed to the example of a credit union that was 97% financed by a local union and which made large loans to union officials, employees, and their family members. *Id.*

The Secretary explained that such "separate organizations pose the same transparency challenges as 'off-the-books' accounting procedures in the corporate setting: large-scale potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classifications, and organizations." 67 Fed. Reg. at 79,282. She concluded that reporting on such organizations that meet the statutory definition of union-related trusts is necessary to give union members an accurate picture of their union's financial condition and operations and to prevent the circumvention or evasion of union reporting requirements on their financial condition and operations. 68 Fed. Reg. at 58,420. The examples illustrate that certain union transactions are being rendered unreportable by reason of the fact they are being carried

out by organizations that are not wholly owned by the related union.

The AFL-CIO concedes, as it must, that the Secretary is empowered to prescribe reports concerning trusts that disclose payments of salaries, compensation, other valuable perquisite to a union officer or employee. Contrary to the AFL-CIO's view, however, neither the statutory definition of "trusts in which a union is interested" nor section 208's requirement that such reporting be "necessary to prevent" limit the Secretary to requiring reporting only after union members' funds have been misused where the trust has not been established or is not controlled by a single union. *Cf. Mourning*, 411 U.S. at 373-74. As the Secretary responds, the AFL-CIO's "rigidly formalistic interpretation" is inconsistent with section 208's express authorization of the Secretary "to require reporting on union-related trusts whenever the Secretary determines such reporting is necessary to effectuate the statute's basic disclosure obligation." Br. of Appellee at 53. Section 208's focus is not on the independent legal status of the trust but on its control over funds provided for the benefit of union members, even if those funds are provided to a separately administered account rather than directly to the union. 67 Fed. Reg. at 79,282. The trusts that the Secretary has identified in her examples are established by one or more unions or through collective bargaining agreements calling for employer contributions, and the union has retained a controlling management role in the organization. *See id.* at 79,283. Their primary purpose is to benefit union members or their beneficiaries. *See id.* They are financed by a union, multiple unions, or employer contributions as a result of collective bargaining agreements. *See id.* The Secretary determined that previous reporting requirements allowed the related union to circumvent or evade reporting on these trusts' financial activities because the related union had not itself established or did not alone control the trust. *Id.* at 79,282-83.

Form T-1 captures such trusts where the trust involves at least $10,000 of union members' funds and requires reporting on those trusts' use of the union members' funds. Section 208 does not limit the Secretary to requiring reporting only in order to disclose transactions involving the misuse of union members' funds because leaving the decision about disclosure to such trusts illustrated by the Secretary's examples would allow unions to circumvent or evade reporting on the use of members' funds diverted to the trust.

However, the AFL-CIO contends that LMRDA Title II reporting requirements, with which section 208 is solely concerned, embodies Congress's categorical legislative judgment that it is in the public interest to require unions to file financial reports disclosing union financial condition and operations and to require union officers and employees to file more narrowly focused financial reports. *See* 29 U.S.C. §§ 432(a), 433(a). The AFL-CIO maintains that the Secretary, in promulgating Form T-1, justified its requirements by reference to her determination that it was in the public interest to enable union members to "determine whether [trust] funds are being spent in ways that benefit the members for whom they were created," 67 Fed. Reg. at 79,283, rather than by reference to whether the requirements were "necessary to prevent" union circumvention or evasion of Title II reporting requirements. In its view, the Secretary has effectively established a new reporting requirement under section 201(b) for some trusts in which a union has an interest without reference to the limitation in the "necessary to prevent" clause of section 208.

There can be little doubt that some of the trust reporting the Secretary has required on Form T-1 is tied to a union's financial reporting requirements under LMRDA Title II. Form T-1 includes reporting on trusts illustrated by the Secretary's examples: trusts  funded by union members' funds from one or

more unions and employers, and, although unions retain a controlling management role, no individual union wholly owns or dominates the trust, and therefore the use of the funds is not reported by the related union under Title II. *See* 68 Fed. Reg. at 58,374. This includes trusts established by one or more unions with union members' funds because such establishment is a reasonable indicium of union control of that trust. The AFL-CIO does not dispute that Title II would otherwise require a union to report its uses of such members' funds. Rather, the AFL-CIO contends that the actual requirements of the final rule are far broader than suggested by the Secretary's examples, and the Secretary's conclusion that additional reporting on significant trusts was "necessary to prevent" was based merely on the fact that the organizations met the statutory definition of "trusts in which [a union] has an interest," and not on the realization that, as the examples illustrated, a union could circumvent or evade Title II's financial reporting requirements by directing union members' funds to such trusts.

Form T-1 requires reporting of all trust assets, liabilities, disbursements, and receipts, and itemization of all major disbursements and receipts. Where a union has directed members' funds to the trusts identified in the Secretary's examples, a union's report on such trust's use of the funds has no less a direct nexus to the union's reporting obligation under Title II than the salary, compensation, and other valuable perquisite to a union official or employee that the AFL-CIO concedes has a direct nexus. The Form T-1 requirements, however, are not limited to addressing only the types of union transactions the Secretary offers to illustrate that additional trust reporting was required to prevent circumvention or evasion of union Title II reporting requirements. Form T-1 reaches information unrelated to union reporting requirements and mandates reporting on trusts even where there is no appearance that the union's contribution of funds to an independent organization could circumvent or

evade union reporting requirements by, for example, permitting the union to maintain control of the funds. This is the salient point our dissenting colleague misses, for the plain text of section 208 itself limits the Secretary's authority with respect to trust reporting. *See* dissenting op. at 4-5. For example, where the union's management role is limited to selecting a single member of a trust's governing board, *see* 29 U.S.C. § 402(*l*)(1), and neither the related union's financial contribution nor that of other unions to the trust dominates the trust's revenues, Form T-1 nonetheless requires the union to report on the trust's other receipts over $10,000. Yet, absent circumstances involving dominant union control over the trust's use of union members' funds or union members' funds constituting the trust's predominant revenues, a report on the trust's financial condition and operations would not reflect on the related union's financial condition and operations, or at least the Secretary has not so found, much less made a determination that such a report would be necessary to prevent circumvention or evasion of union reporting requirements. Our dissenting colleague acknowledges the Secretary must make such findings. See dissenting op. at 4, 8.

At no point, for example, has the Secretary suggested that a union's role in selecting one member of the governing board of an independent organization qualifying as a union-related trust to which at least $10,000 in union members' funds was contributed – which, under the Form T-1 formulation, could comprise infinitely less than 4% of the trust's total revenues, depending on how large the union's total revenues are – demonstrated sufficient union influence over those members' funds, or any other connection that could give rise to circumvention or evasion of a union's Title II reporting requirements. Form T-1, however, would require full financial reporting by such organization. The Secretary's determination that union members would benefit from "more information about

the financial activities of a 'fund in which [a union] has an interest,'" 67 Fed. Reg. at 79,283, obviously is not the same as the determination required by section 208 that reporting on such a fund is necessary to prevent union circumvention or evasion of Title II reporting requirements. Similarly, the Secretary also misconstrued her authority under section 208 when she explained that she was attempting to remedy a problem of existing reporting requirements, namely that "if a union transfers funds to another organization, but does not disclose disbursements made by that organization, union members may have no way to determine whether the funds in question were actually spent for the benefit of members." *Id*. at 79,282. While that may be true, section 208 limits the Secretary's authority to require reporting on trusts to instances where necessary to avoid a union's circumvention or evasion of its Title II reporting requirements; the statute does not provide general authority to require trusts to demonstrate that they operate in a manner beneficial to union members. Thus, although the Secretary's examples illustrate the type of transactions that pertain to the circumvention or evasion of union Title II reporting requirements and therefore permissibly could be included in Form T-1, the flaw in Form T-1 is that it also reaches information unconnected to the circumvention or evasion of union Title II reporting requirements.

That Form T-1 reaches information unrelated to a union's Title II reporting requirements is underscored by contrasting the bright line $10,000 test with an alternative test explored by the Secretary. In proposing Form T-1, the Secretary initially considered use of a "single entity" test – defined in the notice of proposed rulemaking as "an entity that is 'dominated or controlled by the labor organization to such a degree that assets, liabilities, receipts, and disbursements of the entity effectively are those of the union itself.'" 68 Fed. Reg. at 58,415 (quoting 67 Fed. Reg. at 79,285). The Secretary ultimately rejected this

test because it was "less effective than other criteria" inasmuch as a union could conceal its relationship with the related organization, and the test "might be difficult to apply" in some cases. *Id.* at 58,415. Whatever may be the merits of the single entity test, in opting for the bright line test for its ease of application, the Secretary overstepped the limits of section 208. While unambiguous and easy to apply, the $10,000 threshold in Form T-1 is not tied, as the single entity test was, to a union's Title II reporting requirements, and it therefore is manifestly contrary to the statute. Under Form T-1, the bright line test reaches trusts in which a union has neither management control nor financial domination nor any other characteristic found by the Secretary that might give rise to circumvention or evasion of reporting requirements. Where a union has minimal control over trust fund spending and a union's contribution is so small a part of the trust's revenues, and the trust is not otherwise controlled by unions or dominated by union members' funds, the trust lacks the characteristics of the unreported union transactions in the Secretary's examples on which the Secretary based the final rule, and the Secretary has made no other findings that union contribution to such trusts could give rise to the circumvention or evasion of union reporting requirements.

Because section 208 limits the Secretary's authority to promulgate rules requiring financial reporting to what she determines is "necessary to prevent" circumvention or evasion of a union's Title II reporting requirements, we hold that to the extent the Form T-1 requirements apply to union transactions unteathered to that limitation, the promulgation of Form T-1 exceeds the Secretary's authority by requiring general trust reporting.

Accordingly, we affirm the judgment of the district court in part and reverse in part, and we vacate the provisions of the final rule relating to Form T-1.

ROBERTS, *Circuit Judge*, concurring in part and dissenting in part: I concur in Parts I and II of the court's opinion. I must dissent, however, from the conclusion in Part III that the Secretary's interpretation of her trust reporting authority was unreasonable under step two of *Chevron*.

I begin with the statutory language. The source of the Secretary's authority for requiring reporting by union-affiliated trusts is section 208:

> The Secretary shall have authority to issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under this subchapter and such other reasonable rules and regulations (*including rules prescribing reports concerning trusts in which a labor organization is interested*) as he may find necessary to prevent the circumvention or evasion of such reporting requirements.

LMRDA § 208, 29 U.S.C. § 438 (emphasis added).

We need not guess at what constitutes a "trust in which a labor organization is interested," for section 3(*l*) provides a definition:

> "Trust in which a labor organization is interested" means a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

29 U.S.C. § 402(*l*).

The Secretary's rule requires unions that meet the criteria for LM-2 reporting to file an additional report for "any trust in which the labor organization is interested, if the trust has $250,000 or more in annual receipts and the labor organization contributed $10,000 or more to the trust during the reporting year, or that amount was contributed on the labor organization's

behalf." Labor Organization Annual Financial Reports; Final Rule, 68 Fed. Reg. 58,374 (Oct. 9, 2003). The Secretary considered other approaches to defining which trusts posed a risk of being used to circumvent or evade required union reporting, but rejected them "in favor of the statutory definition of a trust in which a labor organization is interested," adding dollar thresholds "so that an undue reporting burden is not imposed on unions with limited finances." *Id.* at 58,413, 58,415.

The Secretary explained why such related entities pose a danger of allowing unions to circumvent their reporting obligations. The Secretary's proposed rulemaking notes that "labor organizations have become more multifaceted and have created hybrid structures for their various activities." Labor Organization Annual Financial Reports; Proposed Rule, 67 Fed. Reg. 79,280 (Dec. 27, 2002). Trusts in which unions have an interest "pose the same transparency challenges as 'off-the-books' accounting procedures in the corporate setting: large-scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." *Id.* at 79,282. Under the earlier rules, union members may have had "no way to determine whether the funds in question were actually spent for [their] benefit." *Id.*

The Secretary pointed to several cases in which union members could not obtain information about a particular trust because no union was required to file a report on its behalf. In one instance, a credit union with 97 percent of deposits attributable to one union local doled out more than half its loans to four loan officers, three of whom were union officials. *Id.* at 79,283. In another, transactions involving a strike fund to which 29 unions contributed went completely unreported because "no single union wholly owned the fund." *Id.* The Secretary reasoned that trust reporting would "properly ensure union democracy, fiscal integrity and transparency in a manner

consistent with the intent of Congress in enacting the LMRDA." *Id.*; *see* S. Rep. No. 86-187, at 41 (1959) ("The committee expects that, in exercising his rulemaking power under [the Senate version of LMRDA § 208], the Secretary of Labor will be vigilant in making sure that all types of special funds shall be reported."). As the district court concluded, "the rulemaking record shows clearly that the Secretary explained, in great detail, her determination that the Form T-1 [trust reporting] is necessary to prevent the circumvention of the LMRDA reporting requirements." *AFL-CIO v. Chao*, 298 F. Supp. 2d 104, 118 (D.D.C. 2004).

Under step two of *Chevron*, that determination is not to be disturbed unless "arbitrary or capricious in substance, or manifestly contrary to the statute." *Household Credit Servs., Inc. v. Pfennig*, 124 S. Ct. 1741, 1748 (2004) (internal quotation marks omitted). "We accord deference to agencies under *Chevron* . . . because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740-41 (1996). The usual deference is heightened in this case, however, for several reasons:

*First*, the statute speaks in terms of what is "necessary" to prevent circumvention or evasion of the reporting required under the statute. This is an inherently discretionary standard that clearly invites further definition by the Secretary. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413–15 (1819); *see also Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 419 (1992) (ICC interpretation of "required" to mean "useful and appropriate" was reasonable in context of statute). Determining what is "necessary" unavoid-

ably calls for the exercise of the Secretary's judgment and expertise.

*Second*, Congress did not merely delegate to the Secretary the authority to require such trust reporting as may *be* necessary to prevent circumvention or evasion, but instead such reporting "as *[s]he may find*" necessary to that end. 29 U.S.C. § 438 (emphasis added). We have noted in the past the "distinction between the objective existence of certain conditions and the Secretary's determination that such conditions are present," stressing that a statute phrased in the latter terms " 'fairly exudes deference' to the Secretary." *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989). While not foreclosing review altogether, *but cf. Drake v. FAA*, 291 F.3d 59, 72 (D.C. Cir. 2002) ("What may be *thought* necessary may not in fact *be* necessary, but a court may pass judgment only on the latter, not the former."), section 208 by its terms "substantially restrict[s] the authority of the reviewing court to upset the Secretary's determination," *Kreis*, 866 F.2d at 1514.

*Third*, the delegation at issue here is to the Secretary to promulgate rules she finds necessary "to prevent" a future contingency — circumvention or evasion of required reporting. 29 U.S.C. § 438. The delegation necessitates a predictive judgment about risk, and "an agency's predictive judgment regarding a matter within its sphere of expertise is entitled to 'particularly deferential' review." *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999). The trust reporting rule represents the Secretary's best judgment as to when union-affiliated trusts are likely to pose a risk of being used to circumvent the reporting requirements. It is a prophylactic rule and, as such, need not be crafted with "exacting precision." *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 350 (D.C. Cir. 1987).

In the face of a statutory delegation freighted with deference, the majority applies the very antithesis of deferential review. My colleagues fault the Secretary's rule because they

believe that the level of trust reporting specified by the Secretary would only be necessary to prevent evasion of the LMRDA requirements in "circumstances involving dominant union control over the trust's use of union members' funds or union members' funds constituting the trust's predominant revenues," Op. at 24, and that the Secretary's examples do not demonstrate a risk of evasion where such circumstances are not present. But nothing in either the LMRDA or the usual standards governing review of agency action under *Chevron* step two demands that the Secretary recite examples to support every possible application of the rule. Rather, we require only that she provide a reasoned explanation for her judgment that reporting is "necessary to prevent . . . circumvention or evasion." 29 U.S.C. § 438. She has clearly done so here. *See supra* pp. 2–3.

The majority's main objection is that the Secretary's rule "mandates reporting on trusts even where there is no appearance that the union's contribution of funds to an *independent organization* could circumvent or evade union reporting requirements by, for example, permitting the union to maintain control of the funds." Op. at 23 (emphasis added). What the majority calls an "independent organization" is, of course, defined in the statute as a "[t]rust in which a labor organization is interested," because it "was created or established by a labor organization, or one or more of the trustees or one or more members of [its] governing body . . . is selected or appointed by a labor organization," and because "a primary purpose of [the organization] is to provide benefits for the members of such labor organization or their beneficiaries." 29 U.S.C. § 402(*l*). The majority may be perfectly comfortable that there is no risk that such an organization may be used by a union to circumvent or evade reporting requirements, but it is surely reasonable for the Secretary — to whom the responsibility has been delegated — to reach a different conclusion.

The majority's reading, far from defining the "bounds of the permissible" under *Chevron* step two, *Barnhart v. Walton*, 535 U.S. 212, 218 (2002), is itself rather implausible. First, it renders largely superfluous the judgment made by Congress when it specifically defined a "trust in which a labor organization is interested." If "circumvention or evasion" carries within it an implicit requirement of union dominance or control beyond the definition in section 3(*l*), there is no need for that definition at all. The majority's approach is akin to a court, presented with a statute permitting the regulation of trucks weighing over ten tons where "necessary to prevent damage to highways," nevertheless exempting trucks under twenty tons on the ground that they present no such risk — as though Congress had made no judgment on the matter. *See Fed. Elec'n Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982) (Court will not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared").

Second, the majority takes an exceedingly narrow view of the purpose of the reporting requirements. It dismisses as somehow irrelevant the Secretary's concern that in the absence of trust disclosure, "union members may have no way to determine whether [union funds transferred to trusts] were actually spent for the benefit of members." 67 Fed. Reg. at 79,282; *see* Op. at 25. Yet, in making the definition of a "trust in which a labor organization is interested" turn on whether one of the primary purposes of the trust is "to provide benefits for [union] members . . . or their beneficiaries," Congress plainly evinced the very same concern. *See* LMRDA § 3(*l*). Indeed, the *whole point* of the LMRDA is to ensure, through broad financial disclosure, that members' funds are not being misappropriated by those to whom the funds have been entrusted. *See* H.R. Rep. No. 86-741, at 7 (1959) ("[t]he members of a labor organization are the real owners of the money and property of such organization and are entitled to a full accounting of all transactions

involving such money"). The statute does not prescribe reporting merely for reporting's sake.

It is a final strike against the plausibility of the majority's reading that it takes no account of the Secretary's need for a bright-line rule in managing what is, fundamentally, a reporting and disclosure scheme. Unlike the express statutory criteria of section 3(*l*) and the Secretary's dollar threshold, the majority's "circumstances involving dominant union control" test, Op. at 24, "would be hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors," *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995). The circumstances of union control will come in many varieties. Presumably, one union-appointed trustee will normally not be enough; but if there are only three trustees, or if one of the other trustees is affiliated with another union, it might be. In deciding to incorporate the statutory definition into her rule, the Secretary explained the difficulties of an alternative approach along the lines endorsed by the majority. *See* Op. at 25–26. She specifically noted that looking to the degree of union ownership and control "does not appear to be a workable or appropriate approach. Union ownership and control in the context of a union's participation in a trust that provides benefits to the union membership are very difficult concepts to quantify." 68 Fed. Reg. at 58,415. The difficulties of such an approach, with the likelihood of attendant litigation, are precisely why the "single entity" test received *zero* favorable comments during rulemaking and ultimately was rejected by the Secretary in favor of the statute's bright-line rule. *See id.* at 58,416.

Perhaps the Secretary was wrong in her assessment about what degree of union involvement in the affairs of a trust poses a danger of the trust being used to circumvent or evade reporting requirements, *but see Time Warner Entertainment Co. v. FCC*, 240 F.3d 1126, 1141 (D.C. Cir. 2001) (FCC's attribution of influence based on control of 5% of company's voting shares

was reasonable), and wrong in her judgment that a multi-factor domination or control test would prove unworkable, and perhaps the majority's approach is right. That is not the question before the court. The statute plainly delegates the authority to make such policy-laden judgments to the Secretary — the question is what "*[s]he* may find necessary to prevent the circumvention or evasion of . . . reporting requirements," 29 U.S.C. § 438 (emphasis added) — and the Secretary has reasonably exercised that authority. I therefore respectfully dissent from Part III of the court's opinion.