**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-1757**

_____

CHAMBER OF COMMERCE OF THE UNITED STATES; SOUTH CAROLINA
CHAMBER OF COMMERCE,

        Plaintiffs – Appellees,

        v.

NATIONAL LABOR RELATIONS BOARD; MARK PEARCE, in his official
capacity as Chairman of the National Labor Relations Board;
BRIAN HAYES, in his official capacity as member of the
National Labor Relations Board; LAFE SOLOMON, in his
official capacity as General Counsel; RICHARD F. GRIFFIN,
JR., Member; TERENCE F. FLYNN, Member; SHARON BLOCK, Member,

        Defendants – Appellants,

        and

CRAIG BECKER, in his official capacity as member of the
National Labor Relations Board,

        Defendant.

-----------------------------

CHARLES J. MORRIS; AMERICAN FEDERATION OF LABOR AND CONGRESS
OF INDUSTRIAL ORGANIZATIONS; CHANGE TO WIN; NATIONAL
EMPLOYMENT LAW PROJECT,

        Amici Supporting Appellants,

THE HONORABLE JOHN KLINE, Chairman, Committee on Education
and the Workforce, United States House of Representatives;
JOE WILSON; RODNEY ALEXANDER; STEVE PEARCE; GREGG HARPER;
PHIL ROE; GLENN THOMPSON; TIM WALBERG; LOU BARLETTA; LARRY
BUCSHON; SCOTT DESJARLAIS; TREY GOWDY; JOE HECK; BILL
HUIZENGA; MIKE KELLY; JAMES LANKFORD; KRISTI NOEM; ALAN

NUNNELEE; REID RIBBLE; TODD ROKITA; AND DANIEL WEBSTER, United States Representatives,

Amici Supporting Appellees.

---

Appeal from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (2:11-cv-02516-DCN)

---

Argued: March 19, 2013                    Decided: June 14, 2013

---

Before DUNCAN, FLOYD and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Floyd and Judge Thacker joined.

---

**ARGUED:** Dawn L. Goldstein, NATIONAL LABOR RELATIONS BOARD, Washington, DC., for Appellants. Lemuel Gray Geddie, Jr., OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, Greenville, South Carolina, for Appellees. **ON BRIEF:** Lafe E. Solomon, Acting General Counsel, Celeste J. Mattina, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Margery E. Lieber, Deputy Associate General Counsel, Eric G. Moskowitz, Assistant General Counsel, Abby Propis Simms, Deputy Assistant General Counsel, Joel F. Dillard, Kevin P. Flanagan, Micah P. S. Jost, NATIONAL LABOR RELATIONS BOARD, Washington, DC., for Appellants. Benjamin P. Glass, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, Charleston, South Carolina, Cheryl M. Stanton, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, New York, New York, for Appellees; Robin S. Conrad, Shane B. Kawka, Rachel L. Brand, NATIONAL CHAMBER LITIGATION CENTER, INC., Washington, D.C., Howard M. Radzely, Jonathan C. Fritts, David M. Kerr, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Appellee Chamber of Commerce of the United States. Charles J. Morris, Professor Emeritus of Law, Dedman School of Law, SOUTHERN METHODIST UNIVERSITY, San Diego, California, for Charles J. Morris, Amicus Supporting Appellants. Lynn Rhinehart, AMERICAN FEDERATION OF LABOR & CONGRESS OF INDUSTRIAL ORGANIZATIONS, Washington, D.C., for American Federation Of Labor And Congress Of Industrial Organizations, Amicus Supporting Appellants; Walter Kamiat, Washington, D.C., for Change to Win, Amicus Supporting

Appellants; Catherine K. Ruckelshaus, Tsedeye Gebreselassie, NATIONAL EMPLOYMENT LAW PROJECT, New York, New York, for National Employment Law Project, Amicus Supporting Appellants; Edgar N. James, Jeff Vockrodt, JAMES & HOFFMAN, PC, Washington, D.C., for Amici Curiae Supporting Appellants. Charles I. Cohen, David R. Broderdorf, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C.; Joshua W. Dixon, K&L GATES LLP, Charleston, South Carolina; Philip A. Miscimarra, Ross H. Friedman, Rita Srivastava, MORGAN, LEWIS & BOCKIUS LLP, Chicago, Illinois; Andriette A. Roberts, MORGAN, LEWIS & BOCKIUS LLP, New York, New York, for Amici Curiae Supporting Appellees.

---

DUNCAN, Circuit Judge:

The National Labor Relations Board (the "NLRB" or the "Board"), after notice and comment, promulgated a rule that would require employers subject to the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. §§ 151-169, to post an official Board notice informing employees of their rights under the Act. Any employer failing to post the notice would be subject to: (1) a finding that it committed an unfair labor practice; (2) a tolling of statutes of limitation for charges of any other unfair labor practices; and (3) a finding of anti-union animus that would weigh against it in any proceedings before the Board. Notification of Employee Rights Under the National Labor Relations Act, 76 Fed. Reg. 54,006 (Aug. 30, 2011) (codified at 29 C.F.R. pt. 104).

The Chamber of Commerce of the United States and the South Carolina Chamber of Commerce (collectively, "the Chamber") sought final review of the rule. The district court determined that in promulgating the notice-posting rule, the Board exceeded its authority, in violation of the Administrative Procedure Act (the "APA"). Looking to the plain language of the NLRA, its structure, its legislative history, and the notice provisions in other statutes, the court concluded that the Act does not provide the Board with the power to enact such a rule. The court therefore granted summary judgment to the Chamber.

4

We agree with the district court that the rulemaking function provided for in the NLRA, by its express terms, only empowers the Board to carry out its statutorily defined reactive roles in addressing unfair labor practice charges and conducting representation elections upon request. Indeed, there is no function or responsibility of the Board not predicated upon the filing of an unfair labor practice charge or a representation petition. We further note that Congress, despite having enacted and amended the NLRA at the same time it was enabling sister agencies to promulgate notice requirements, never granted the Board the statutory authority to do so. We therefore hold that the Board exceeded its authority in promulgating the challenged rule, and affirm.

## I.

After discussing the structure and purpose of the NLRA, we describe the background of the challenged rule. We then briefly recount the procedural history of this case.

### A.

#### 1.

The NLRA governs relations between private sector employers, labor unions, and employees. Congress enacted the NLRA--originally referred to as the "Wagner Act," after its sponsor, Senator Robert F. Wagner--in 1935. Pub. L. No. 74-198,

5

49 Stat. 449 (1935).  The Act has since been amended three times, most recently in 1974.  See Labor Management Relations Act ("Taft-Hartley Act"), Pub. L. No. 80-101, 61 Stat. 136 (1947); Labor Management Reporting and Disclosure Act ("Landrum-Griffin Act"), Pub. L. No. 86-257, 73 Stat. 519 (1959); Health Care Amendments, Pub. L. No. 93-360, 88 Stat. 395 (1974).

The first section of the Act lays out the national labor policy, which the Board is intended to promote "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."  29 U.S.C. § 151.  Section 2 provides definitions, and Sections 3, 4, and 5 establish the Board and lay out its structure.[1]

---

[1] Although the structure of the Board is not at issue in this case, it bears noting that the Secretary of Labor at the time of the NLRA's passage expressed concern that while the NLRB was to be "judicial in character," the "disconcerting tasks of administration" might make it "subject to distraction from specific cases by the temptation to strengthen its prestige through educational and administrative activities."  H.R. Rep. No. 74-969 (1935), reprinted in 2 NLRB, Legislative History of the National Labor Relations Act, 1935, at 2919 (1949) ("NLRA Leg. Hist.").

Section 6--the focus of this case--confers rulemaking power on the Board, providing it with the "authority from time to time to make, amend, and rescind, in the manner prescribed by [the APA], such rules and regulations as may be necessary to carry out the provisions of [the NLRA]." Id. § 156. Section 7 lists employees' core labor rights, including the rights to organize, join unions, bargain collectively through representatives of their choosing, and engage in concerted activities for collective bargaining or mutual aid and protection. Section 8 lays out five specific unfair labor practices ("ULPs"). Of particular significance to this case, Section 8(a)(1) makes it a ULP "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." Id. § 158(a)(1). Section 8(c) provides that the expression of views in any form "shall not constitute or be evidence of [a ULP] . . ., if such expression contains no threat of reprisal or force or promise of benefit." Id. § 158(c).

The core, specified functions of the NLRB are (1) to conduct representation elections, and (2) to prevent and resolve ULPs. Section 9 of the NLRA provides for the first of these, authorizing the filing of representation petitions, in which a petitioner alleges that a substantial number of employees wish to be represented by a union for collective bargaining. Under that section, the Board has the authority to investigate

7

questions of representation, hold secret-ballot elections, and certify the results thereof. Section 10 provides the Board with the authority to investigate, prevent, and remedy ULPs. All proceedings under Sections 9 and 10 "originate with the filing of charges or petitions by employees, labor unions, private employers, and other private parties." NLRB, 2011 FY Performance and Accountability Report 12, available at http://www.nlrb.gov/sites/default/files/documents/189/nlrb_2011_par_508.pdf (last visited May 31, 2013); see also Notification of Employee Rights Under the National Labor Relations Act, 76 Fed. Reg. at 54,010 ("In both instances, the initiating document is filed by a private party."). Thus, "[a]lthough the Board is specifically empowered to 'prevent' unfair labor practices, 'the Board may not act until an unfair labor practice charge is filed alleging a violation of the Act.' In addition, certification 'procedures are set in motion with the filing of a representation petition.'" Notification of Employee Rights Under the National Labor Relations Act, 76 Fed. Reg. at 54,010 (quoting 2 The Developing Labor Law 2662, 2683 (John E. Higgins, Jr. ed., 5th ed. 2006)) (alterations omitted).[2]

_____

[2] As we discuss in comparing the NLRA to other federal labor legislation, the NLRB's reactive mandate stands in stark contrast to the proactive roles of other labor agencies that have promulgated notice-posting requirements. While the NLRA only provides for processes that may be initiated by third
(Continued)

The final provision relevant to this case, Section 11, gives the Board investigatory powers "necessary and proper for the exercise of the powers vested in [the Board]" by Sections 9 and 10, including the right to issue subpoenas. 29 U.S.C § 161. Because of the reactive nature of the Board's functions under Sections 9 and 10, Section 11 provides it with no "roving investigatory powers." Notification of Employee Rights Under the National Labor Relations Act, 76 Fed. Reg. at 54,010; see also H.R. Rep. No. 74-969 (1935), reprinted in 2 NLRA Leg. Hist. at 2932.

2.

The Board promulgated the challenged rule, titled "Notification of Employee Rights Under the National Labor Relations Act," on August 30, 2011, after a notice and comment period. Notification of Employee Rights Under the National Labor Relations Act, 76 Fed. Reg. at 54,006. The rule is composed of three subparts. Subpart A, which is at issue in this appeal, provides that "[a]ll employers subject to the NLRA must post notices to employees, in conspicuous places, informing them of their NLRA rights, together with Board contact

---

parties, the authorizing legislation of these sister agencies speaks to investigatory and enforcement functions that the agencies may themselves initiate. See infra Part II.B.4.

9

information and information concerning basic enforcement procedures." 29 C.F.R. § 104.202(a). The text of the notice explains to employees:

> The [NLRA] guarantees the right of employees to organize and bargain collectively with their employers, and to engage in other protected concerted activity or to refrain from engaging in any of the above activity. Employees covered by the NLRA are protected from certain types of employer and union misconduct. This Notice gives you general information about your rights, and about the obligations of employers and unions under the NLRA. Contact the [NLRB], the Federal agency that investigates and resolves complaints under the NLRA, using the contact information supplied below, if you have any questions about specific rights that may apply in your particular workplace.

Id. at Pt. 104, Subpt. A, App. (footnote omitted). It goes on to list employees' rights under the Act and provide information as to how to "contact the NLRB promptly to protect your rights." Id.

Subpart B makes failure to post the employee notice a ULP under Section 8(a)(1) of the NLRA. Id. § 104.210. If, after an adjudication, the Board finds that an employer has failed to post the required notice, the Board will order the employer to cease and desist the unlawful conduct and post the required notice, along with a remedial notice. Id. § 104.213. If an employee files a ULP charge complaining that an employer has failed to post a notice, the Board may excuse the employee from the usual six-month statute of limitations for any other ULP

10

charges.  Id. § 104.214(a).  Finally, the rule allows the Board to "consider a knowing and willful refusal to comply with the requirement to post the employee notice as evidence of unlawful motive" in other proceedings before it.  Id. § 104.214(b).[3]

The Board's principal rationale for introducing the notice-posting rule was that "American workers are largely ignorant of their rights under the NLRA, and this ignorance stands as an obstacle to the effective exercise of such rights."  Proposed Rules Governing Notification of Employee Rights Under the National Labor Relations Act, 75 Fed. Reg. 80,410, 80,411 (Dec. 22, 2010) (codified at 29 C.F.R. pt. 104).  The Board pointed to the changing nature of the American workforce as part of the cause of this knowledge gap--in particular, the Board noted that "[t]he overwhelming majority of private sector employees are not represented by unions, and thus lack an important source of information about NLRA rights"; "[i]mmigrants, who comprise an increasing proportion of the nation's work force, are unlikely to be familiar with their workplace rights, including their rights under the NLRA"; and "high school students, many of whom are about to enter the labor force, are uninformed about labor law and labor relations."  Id.  The Board explained that

---

[3] Subpart C of the rule contains ancillary provisions not relevant to this appeal.

employees' lack of awareness of their rights stems in part from the absence of any requirement that they be informed of those rights. The Board noted that "[t]he NLRA is almost unique among major Federal labor laws in not including an express statutory provision requiring employers routinely to post notices at their workplaces informing employees of their statutory rights." Id.[4]

The challenged rule is unusual in several respects. The Board has only rarely engaged in rulemaking during its seventy-seven year history. And it has never promulgated a notice-posting rule of any kind.[5]

In the public comment period that followed the promulgation of the rule, the Board received over 7,000 submissions, the majority of which opposed the rule or aspects of it.

---

[4] As the Board observed, a number of other federal labor statutes contain explicit employee notice provisions. See Railway Labor Act ("RLA"), 45 U.S.C. § 152, Fifth, Eighth; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-10(a); Age Discrimination in Employment Act, 29 U.S.C. § 627; Occupational Health and Safety Act, 29 U.S.C. § 657(c); Employee Polygraph Protection Act, 29 U.S.C. § 2003; Americans with Disabilities Act, 42 U.S.C. § 12115; Family and Medical Leave Act, 29 U.S.C. § 2619(a); Uniformed Service Employment & Reemployment Rights Act, 38 U.S.C. § 4334(a).

[5] The Board has, on a case-by-case basis, required individual employers found to have committed ULPs to post remedial Board-supplied notices informing employees of their rights under the Act. See, e.g., Smithfield Packing Co., 344 N.L.R.B. 1, 15-16 (2004), aff'd, United Food and Commercial Workers Union Local 204 v. NLRB, 447 F.3d 821, 828 (D.C. Cir 2006).

Notification of Employee Rights Under the National Labor Relations Act, 76 Fed. Reg. at 54,007. Many comments "dispute[d] the board's statutory authority to enact the proposed rule." Id. at 54,008.[6]

B.

On September 19, 2011, before the rule went into effect, the Chamber filed a complaint in the District Court for the District of South Carolina for injunctive relief against the NLRB, its Members, and its General Counsel. The parties filed cross motions for summary judgment on November 9, 2011, and the district court granted summary judgment to the Chamber on April 13, 2012. This appeal followed.

Concurrently, the National Association of Manufacturers filed a suit against the NLRB in the District Court for the District of Columbia. See Nat'l Ass'n of Mfrs. v. NLRB, 846 F.

---

[6] Additionally, Member Brian Hayes dissented from the Board's Notice of Proposed Rulemaking, arguing that "[t]he Board lacks the statutory authority to promulgate or enforce" the rule. Proposed Rules Governing Notification of Employee Rights Under the National Labor Relations Act, 75 Fed. Reg. at 80,415. Specifically, Member Hayes determined that Section 6 was not sufficient authority for imposing such a requirement: "[t]o the contrary, Section 10 of the Act indicates to me that the Board clearly lacks the authority to order affirmative notice-posting action in the absence of an unfair labor practice charge filed by an outside party." Id. Member Hayes ultimately dissented from the promulgation of the final rule as well. Notification of Employee Rights Under the National Labor Relations Act, 76 Fed. Reg. at 54,037-42.

13

Supp. 2d 34 (D.D.C. 2012). That court granted summary judgment to the NLRB. The National Association of Manufacturers appealed to the D.C. Circuit, which reversed the district court's decision, holding that the notice-posting rule violates Section 8(c) of the NLRA, which prohibits the NLRB from finding employer speech that is not coercive to be a ULP or evidence of a ULP. Nat'l Ass'n of Mfrs. v. NLRB, --- F.3d ----, 2013 WL 1876234 (D.C. Cir. May 7, 2013).[7] Judge Henderson, joined by Judge Brown, wrote a concurrence, opining that the Board also lacked authority under Section 6 to issue the rule. Id. (Henderson, J., concurring).

## II.

### A.

Preliminary to our consideration of the challenged rule are threshold inquiries as to the appropriate mode of analysis. We first address the Board's proposition that the notice-posting rule should be analyzed under the deferential standard set forth in Mourning v. Family Publications Service, Inc., 411 U.S. 356

---

[7] Although the Chamber made a similar argument below, the parties did not address this issue in their briefs or during oral argument before this court. Because we determine that the Board had no authority to issue the rule, we do not reach the question of whether it was also precluded from doing so by Section 8(c).

(1973).  Next, we choose between two competing lenses through which to analyze the issue of the Board's authority, determining if, as the Board contends, the relevant question is whether Congress intended to <u>withhold</u> authority to issue the challenged rule from the Board, or if, as the Chamber argues, the relevant question is whether Congress intended to <u>grant</u> that authority.

1.

We start with the Board's argument that the challenged rule is properly analyzed under <u>Mourning</u>.  <u>Mourning</u> instructs that rules issued pursuant to broad rulemaking grants such as Section 6 are to be upheld if they are "reasonably related to the purposes of the enabling legislation."  411 U.S. at 369 (citations and internal quotation marks omitted).  The Board reasons that <u>Mourning</u> provides the appropriate framework because while the familiar two-step mode of analysis laid out by <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984), applies to an agency's construction of a statute, "<u>Mourning</u>'s aim is to analyze substantive rules that carry out an agency's enabling act, but do not necessarily interpret specific statutory language."  Appellant's Br. at 5.

We find this distinction untenable.  <u>Mourning</u>, a pre-<u>Chevron</u> case, requires that a court "defer to the informed experience and judgment of the agency <u>to whom Congress delegated appropriate authority</u>."  411 U.S. at 372 (emphasis added).

15

Thus, Mourning applies only after a court has determined that Congress has indeed delegated interpretative powers to that agency. See AFL-CIO v. Chao, 409 F.3d 377, 384 (D.C. Cir. 2005); see also City of Arlington v. FCC, --- S. Ct. ----, 2013 WL 2149789, at *8-9 (May 20, 2013) (holding that the Chevron framework applies to an agency's statutory interpretation concerning the scope of its own authority).

2.

Notwithstanding the facial inapplicability of Mourning, the Board contends that it should be considered to have the power to promulgate the rule unless Congress expressly withheld that authority.

The Chamber, on the other hand, contends that we should invalidate the notice-posting rule unless we find that Congress intended to delegate to the Board the power to issue it. The Chamber's view finds support in our precedent. Specifically, in determining the appropriate framework under which to analyze the Food and Drug Administration's ("FDA's") power to promulgate a challenged regulation, we deemed the question of whether Congress intended to grant authority the appropriate one. See Brown & Williamson Tobacco Corp. v. FDA, 153 F.3d 155, 161 (4th Cir. 1998) ("The district court framed the issue as 'whether Congress has evidenced its clear intent to withhold from FDA jurisdiction to regulate tobacco products as customarily

16

marketed.' However, we are of opinion that the issue is correctly framed as whether Congress intended to delegate such jurisdiction to the FDA."), aff'd, 529 U.S. 120 (2000). Other courts have followed the same approach. See, e.g., Am. Bar Ass'n v. FTC, 430 F.3d 457, 468 (D.C. Cir. 2005) ("Plainly, if we were 'to presume a delegation of power' from the absence of 'an express withholding of such power, agencies would enjoy virtually limitless hegemony . . . .'" (quoting Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd., 29 F.3d 655, 671 (D.C. Cir. 1994))); Sierra Club v. EPA, 311 F.3d 853, 861 (7th Cir. 2002) ("Courts 'will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.'" (quoting Am. Petroleum Inst. v. EPA, 52 F.3d, 1113, 1120 (D.C. Cir. 1995))).

In support of its contention to the contrary, the Board cites American Hospital Association v. NLRB ("AHA"), 499 U.S. 606 (1991). In AHA, the Supreme Court addressed a challenge to a rule defining collective bargaining units for acute care hospitals. The plaintiffs there argued that because Section 9(b) of the NLRA requires the Board to make bargaining unit determinations "in each case," the Board could not use its general rulemaking power under Section 6 to define bargaining units. The Court determined that because Section 9(a) authorizes the Board to decide whether a designated unit is

appropriate for the purposes of collective bargaining, it could promulgate a rule proactively defining collective bargaining units in acute care hospitals, rather than determining the composition of such units through case-by-case adjudication. The Court noted that "[a]s a matter of statutory drafting, if Congress had intended to curtail in a particular area the broad rulemaking authority granted in § 6, we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section." AHA, 499 U.S. at 613.

The language in AHA that provides the basis for the Board's argument, arising as it does in the context of a bargaining unit determination as to which the Board has been legislatively granted authority, is inapplicable to the challenged rule. At issue in AHA was whether Section 9(b) limited the Board's general authority--granted by Section 6--to enact rules necessary to carry out Section 9. Here, on the other hand, there is simply no authority to be limited: as we emphasize again, there is no general grant of power to the NLRB outside the roles of addressing ULP charges and conducting representation elections. Indeed, the fact that none of the Act's provisions contain language specifically limiting the Board's authority to enact a notice-posting requirement reflects

18

the absence of statutory authority for actions outside those defined responsibilities as a threshold matter.

Moreover, in AHA, the Supreme Court was careful to limit its determination that authority existed for the promulgation of "the rule at issue in this case unless limited by some other provision in the Act."  499 U.S. at 610 (emphasis added).  This narrow statement must be read in its context; it does not support the proposition that the NLRB may enact any rule it wishes unless some provision of the Act expressly withholds authority for it to do so, when no general authority has been given by Congress in the first instance.  Thus, in our analysis here, we focus on the question of whether Congress intended to grant the NLRB the authority to issue the challenged rule--and not whether Congress intended to withhold that power.

B.

Having determined the appropriate framework, we consider the notice-posting rule under Chevron.  We ask "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  467 U.S. at 842-43.  Only "if the statute is silent or ambiguous with respect to the specific issue" are we to proceed to Chevron's second step,

asking "whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

Under Chevron's first step, we must use the "traditional tools of statutory construction" to ascertain congressional intent. 467 U.S. at 842 n.9. We thus look to the text of the statute, along with "the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and . . . other relevant statutes." Brown & Williamson, 153 F.3d at 162 (citations and quotation marks omitted). We are only to employ the deference of step two when the "devices of judicial construction have been tried and found to yield no clear sense of congressional intent." Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004). Because we do not presume a delegation of power simply from the absence of an express withholding of power, we do not find that Chevron's second step is implicated "any time a statute does not expressly negate the existence of a claimed administrative power." Am. Bar Ass'n, 430 F.3d at 468 (citation and internal quotation marks omitted).

1.

In assessing the validity of the notice-posting rule, we begin by examining the plain language of the NLRA. See CSX Transp., Inc. v. Ala. Dep't of Revenue, 131 S. Ct. 1101, 1107 (2011). Thus, we look to the text of Section 6 of the Act,

20

which grants the Board authority to issue rules that are "necessary to carry out" the provisions of the Act. 29 U.S.C. § 156.

We, like the Chamber, read the language in Section 6 as requiring that some section of the Act provide the explicit or implicit authority to issue a rule. Because the Board is nowhere charged with informing employees of their rights under the NLRA, we find no indication in the plain language of the Act that Congress intended to grant the Board the authority to promulgate such a requirement.

The Board contests this reading of the statute, arguing that the word "necessary" is inherently ambiguous, bringing us directly to Chevron's step two. In support of this argument, the Board relies, in part, on language from Mourning explaining that "[w]here the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act,'" we are to sustain the validity of a regulation promulgated thereunder "so long as it is 'reasonably related to the purposes of the enabling legislation.'" 411 U.S. at 369 (citations omitted). However, as we have explained, this guidance is relevant only once we have determined that a statute is ambiguous. That is, we are only to defer to an agency's interpretation of what is "necessary" once we have progressed to

21

Chevron's second step. Mourning's exhortation that we "defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority," id. at 372, thus cannot be read as requiring us to defer to the agency's interpretation as we conduct our initial analysis of the Act.

Moreover, even if the term "necessary," standing on its own, may be deemed ambiguous, we need not automatically defer to the Board's interpretation. "'Mere ambiguity in a statute is not evidence of congressional delegation of authority.'" Am. Bar Ass'n, 430 F.3d at 469 (quoting Michigan v. EPA, 268 F.3d 1075, 1082 (D.C. Cir. 2001)). Rather, "[t]he ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity." Id. "Even when Congress has stated that the agency may do what is 'necessary,' whatever ambiguity may exist cannot render nugatory restrictions that Congress has imposed." AFL-CIO, 409 F.3d at 384 (citation omitted). Thus, as the district court correctly observed, "[t]he Board may not disregard restrictions Congress has imposed on its authority in other sections of the governing statute by relying on Section 6 in isolation to these substantive provisions." Chamber of Commerce v. NLRB, 856 F.

Supp. 2d 778, 790 (D.S.C. 2012).[8]  As we discuss in greater detail below, the substantive provisions of the Act make clear that the Board is a reactive entity, and thus do not imply that Congress intended to allow proactive rulemaking of the sort challenged here through the general rulemaking provision of Section 6.[9]

2.

Continuing with our analysis of the rule under Chevron's first step, we next consider the structure of the NLRA.  "In

---

[8] The Ninth Circuit drew the same conclusion in striking down an NLRB regulation prohibiting Board employees from producing files in response to subpoenas, reasoning that although Section 6 authorizes the Board to "adopt rules and regulations to carry out its functions in a manner consistent with the fulfillment of the purposes of the Act," the statute "does not authorize the Board to promulgate rules and regulations which have the effect of enlarging its authority beyond the scope intended by Congress." Gen. Eng'g, Inc. v. NLRB, 341 F.2d 367, 374 (9th Cir. 1965).

[9] The Board points out that in AHA the Supreme Court approved the Board's promulgation of a rule defining certain bargaining units proactively--rather than in response to the filing of a representation petition--as an acceptable use of the power delegated to the Board under Section 6.  However, the determination of bargaining units is one of the roles Congress expressly intended the Board to play. See 29 U.S.C. § 159.  In contrast, the NLRA--unlike many other labor statutes--is silent as to any role for its administering agency in enacting notice-posting requirements or any affirmative duty for employers to post notices.  Moreover, as the district court noted, the bargaining units rule at issue in AHA "defined how the Board would handle issues after the Board's adjudicative authority was triggered." Chamber of Commerce, 856 F. Supp. 2d at 791.  Here, the Board attempts something distinct and novel: the proactive imposition of a duty upon employers that does not flow from any of the provisions of the Act.

23

determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning--or ambiguity--of certain words or phrases may only become evident when placed in context." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 133, 132 (2000). Thus, in addition to the language of Section 6 itself, we must look to "the specific context in which that language is used, and the broader context of the statute as a whole." McLean v. United States, 566 F.3d 391, 396 (4th Cir. 2009) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)). An examination of the rest of the Act reveals no provision that a notice-posting rule is "necessary" to carry out.

The Board points to a number of sections in the Act, arguing that the rule is necessary to carry them out. The Chamber responds that no provision in the Act requires employers who have not committed labor violations to be subject to a duty to post employee notices. We agree. The NLRB serves expressly reactive roles: conducting representation elections and resolving ULP charges. As an examination of the Act as a whole makes evident, none of its sections imply that Congress intended to grant the Board authority to issue the notice-posting rule sua sponte.

24

First, Section 1, which lays out the purpose and aspirations of the NLRA, does not provide the Board with authority to act. The Board argues that because Section 1 sets forth the Act's policy in broad terms, it is "specifically designed to permit the Board to spell out [its] applications." Appellant's Br. at 39. However, any argument that the statute's statement of purpose can provide the agency with the authority to promulgate any regulation in furtherance of that purpose is unavailing. The NLRB is "'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n, 466 F.3d 134, 139 (D.C. Cir. 2006) (quoting MCI Telecomms. Corp. v. AT&T, 512 U.S. 218, 231 n.4 (1994)).

Similarly, Section 7, which lists rights protected under the Act, does not provide the Board with specific authority to act. Indeed, language in the Board's own brief belies its argument. The Board contends that the challenged rule is necessary to "carry out the core rights set forth by Section 7." Appellant's Br. at 11 (internal quotation marks omitted). However, while these rights exist thanks to the NLRA and are to be protected in the manner set forth by the NLRA's provisions, significantly, rights are not functions or provisions to be "carried out." See Nat'l Ass'n of Mfrs., 2013 WL 1876234, at

25

*15 (Henderson, J., concurring) ("Neither [Section 1 nor Section 7] contains any particularized 'provision' that the Board can 'carry out' by regulation or otherwise.").

Nor does Section 8, which defines ULPs under the Act, provide the Board with the power to require the posting of notices. The Board notes that its authority under Section 6 extends to defining what constitutes a ULP under Section 8(a)(1), and argues that Section 8 thus gives it authority to promulgate the notice-posting rule, which makes it a ULP to fail to post the employee notice. Specifically, from its power to interpret what constitutes "interfere[nce] with, restrain[t], or coerc[ion of] employees in the exercise of the rights guaranteed in [Section 7]," 29 U.S.C. § 158(a)(1), the Board attempts to extract the authority to create a new ULP based on the failure to post notices educating employees about their Section 7 rights. While we recognize that the Board has the responsibility to "adapt the Act to changing patterns of industrial life," NLRB v. J. Weingarten, Inc., 420 U.S. 251, 266 (1975), and that Congress did not "undertake the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice," Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798 (1945), we cannot accept an interpretation of the Act that would allow the NLRB to

bootstrap Section 8(a)(1) into authority to enact the unprecedented rule at issue here.

Finally, and of most significance, the notice-posting rule is not "necessary to carry out" Sections 9 and 10, which set forth the Board's responsibilities for conducting representation elections and adjudicating ULP charges. As we have discussed, Sections 9 and 10 lay out reactive roles for the Board; the processes they provide for are not set in motion until a party files a representation petition or a ULP charge. The Board contends that the Act presupposes knowledge of NLRA rights and their enforcement mechanisms, and that "employee knowledge of NLRA rights and how to enforce them within statutory timeframes is crucial to effectuate Congress's national labor policy through the processes established by Sections 8, 9, and 10." Appellant's Br. at 12. Essentially, the Board argues that because the enforcement functions provided for by Sections 9 and 10 are reactive, it was necessary to proactively create the challenged rule in order for employees to undertake their role in instigating those processes. With this reasoning, the Board attempts to derive from provisions governing the functions and operation of the agency the authority to do something entirely distinct from those functions, with the rationale that doing so would make them more effective. However, regardless of how laudable the NLRB's goal of educating workers may be, "there is

nothing in the text of the NLRA to suggest the burden of filling the 'knowledge gap' should fall on the employer's shoulders." Nat'l Ass'n of Mfrs., 2013 WL 1876234, at *16 (Henderson, J., concurring). Put simply, we cannot accept the Board's circular argument; the Board may not justify an expansion of its role to include proactive regulation of employers' conduct by noting its reactive role under the Act.[10]

---

[10] The Board also cites Section 11 of the Act in support of its argument that had Congress intended to limit the Board's authority to promulgate the notice-posting regulation, it would have expressed that limitation somewhere in the statute. The Board contrasts Section 6, which contains no words of limitation, with Section 11, which details the Board's subpoena power but explicitly limits that authority to "hearings and investigations . . . necessary and proper for the exercise of the powers vested in [the Board] by sections [9] and [10]." 29 U.S.C. § 161. This language in Section 11 demonstrates, argues the Board, that "when Congress wants to limit the Board's power by reference to Sections 9 and 10, it does so explicitly." Appellant's Br. at 30. We find this comparison unavailing because it is based on the incorrect premise that the Board should be considered to have the power to issue the challenged rule unless Congress expressly withheld that authority. Moreover, we note that in Section 11, the NLRA creates a specific power, to which it attached specific limits. The authority delegated under Section 6 is unquestionably broader, but as we have explained, the fact that Congress did not attach explicit limits to it does not make it limitless. Furthermore, detailing limits similar to those in Section 11 could have constrained the Board in ways not intended by Congress. See Appellees' Br. at 20 n.4 ("[I]t would not have made sense for Congress to limit the Board's rulemaking authority only to Section 9 and 10 of the Act because that would have prevented the Board, for example, from promulgating rules defining any ambiguous provisions in Section 8.").

28

Contrary to the Board's assertions, our analysis of the Act's structure comports with the Supreme Court's holding in AHA. At issue in AHA was whether the Board could define employee bargaining units proactively and universally, outside the context of case-by-case adjudication. In that case, even the challengers of the rule conceded that the Board could make such a determination through adjudication. AHA, 499 U.S. at 612. Here, in contrast, the question is not whether the notice-posting requirement could be established through rulemaking as opposed to adjudication, but whether the Board has the authority to require universal, preemptive notice-posting at all.[11] The Board's contention that AHA established that the NLRB has the authority to undertake proactive measures such as the challenged regulation thus reads the Court's opinion too broadly.[12]

---

[11] We do not take issue with the Board's practice of requiring individual employers to post notices on a case-by-case basis in response to ULP adjudications. See supra note 5.

[12] The Board cites a number of cases in which it has articulated rules of general applicability through adjudication in arguing that it could have developed the challenged rule through case-by-case adjudication. See, e.g., St. Francis Med. Ctr., 347 N.L.R.B. 368, 369 (2006); Tech. Serv. Solutions, 324 N.L.R.B. 298, 301 (1997); Champagne Color, Inc., 234 N.L.R.B. 82, 82 (1978). However, those cases were all adjudications resulting from ULPs and based on rights explicitly granted by the NLRA. Here, the Board seeks to create a duty and a ULP from whole cloth, based not on the rights enumerated in the NLRA, which it does not specifically assert employers are infringing, but on employees' need--nowhere mentioned in the NLRA--to be made aware of their rights under the Act.

29

We also find the history of the NLRA instructive, particularly vis-a-vis congressional treatment of sister agencies with statutory authorization to require the posting of notices. We find that the Act's history provides no countervailing evidence of an intent to bestow the Board with the power to enact the challenged regulation.

Reports on early versions of the NLRA indicate that the Board was designed to serve a reactive role, with its "quasi-judicial power" being "restricted to [the enumerated] unfair labor practices and to cases in which the choice of representatives is doubtful." S. Rep. No. 73-1184 (1934), reprinted in 1 NLRA Leg. Hist. at 1100. There is no indication in the Act's legislative history of an intent to allow the Board to impose duties upon employers proactively; indeed, if anything, it appears to have been the intent of Congress that the Board not be empowered to play such a role. Cf. H.R. Rep. No. 74-969 (1935), reprinted in 2 NLRA Leg. Hist. at 2932 (noting that Section 11 does not grant the Board the powers of a "roving commission").

Of particular significance, Congress considered and rejected a different notice provision in the NLRA that would have required any employer that was a party to a contract that conflicted with the NLRA to notify its employees of the

violation and indicate that the contract would be abrogated.  S. 2926, 73rd Cong. § 304(b) (as introduced in Senate on Feb. 28, 1934), reprinted in 1 NLRA Leg. Hist. at 14; H.R. 8434 73rd Cong. § 304(b) (as introduced in House Mar. 1, 1934), reprinted in 1 NLRA Leg. Hist. at 1140.[13]  In the spring of 1934, as the bill was being considered, the Senate Committee on Education and Labor expressed "unanimous" agreement for removing the section containing that notice provision, 1 NLRA Leg. Hist. at 394-95, and on May 26, 1934, a substitute bill--with the notice provision removed--was reported favorably to the Senate.  S. 2926, 73rd Cong. § 304(b) (as introduced in Senate on May 26, 1934), reprinted in 1 NLRA Leg. Hist. 1070-98.  Although this notice provision would have spoken to a different issue than the one at hand, the fact that Congress considered the possibility of a notice requirement indicates at the very least that

---

[13] Along with the proposed requirement that employers notify employees of contracts that violated the NLRA, the initial versions of the Act made it a ULP to fail to provide that notice.  S. 2926, 73rd Cong. § 5(5) (as introduced in Senate on Feb. 28, 1934), reprinted in 1 NLRA Leg. Hist., at 3; H.R. 8434 73rd Cong. § 5(5) (as introduced in House Mar. 1, 1934), reprinted in 1 NLRA Leg. Hist. at 1130.  The fact that the early versions of the Act contained a specific, notice-related ULP further weakens the Board's attempt, addressed above, to bootstrap authority for the challenged rule from its authority to define what constitutes a ULP under Section 8(a)(1).  Had Congress intended to require the posting of notices, or make the failure to do so be punishable as a ULP, it could have made that intent clear in its legislation.

Congress was aware of the option of authorizing such action and chose not to.

Moreover, at the same time as it excluded a notice provision from the NLRA, Congress amended another labor statute, the RLA, to include two notice provisions.  Pub. L. No. 73-442, 48 Stat. 1185 (1934) (codified as amended at 45 U.S.C. § 151 et seq.).  First, Congress amended the RLA to require employers subject to that Act to notify employees that, if any contract requiring employees to join a union or not join a union had been enforced, such contract was no longer binding.  S. 3266, 73d Cong. § 2, Fifth (as introduced Mar. 28, 1934), reprinted in 1 The Railway Labor Act of 1926: A Legislative History at 742 (Michael H. Campbell & Edward C. Brewer III eds. 1988) ("RLA Leg. Hist."); H.R. 9861, 73d Cong. § 2, Fifth (as introduced Jun. 4, 1934), reprinted in 1 RLA Leg. Hist. at 894.  This provision was very similar to the abrogation and notice provision included in the original NLRA House and Senate bills. A second provision included in the amended RLA required employers to inform their employees by printed notice of the dispute-resolution provisions of the RLA.  S. 3266, 73d Cong. § 2, Eighth (as introduced Mar. 28, 1934), reprinted in 1 RLA Leg. Hist. at 743-44; H.R. 9861, 73d Cong. § 2, Eighth (as introduced Jun. 4, 1934), reprinted in 1 RLA Leg. Hist. at 895-96.  These notice requirements--which were signed into law on June 21,

32

1934--support the proposition that when Congress intends for the posting of notices to be required, it provides as much in its legislation.

4.

Finally, we consider "'the history of evolving congressional regulation in the area.'" Brown & Williamson, 153 F.3d at 162 (quoting Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 475 (1997)). A comparison of the NLRA to subsequent labor legislation provides additional evidence that Congress did not intend to grant the Board the authority to issue a notice-posting requirement.

In addition to the notice-posting requirement in the RLA, Congress has included notice-posting requirements in a number of other federal labor laws. Several labor statutes passed during the span of years between 1935 and 1974, during which the NLRA was amended three times, provide for the posting of notices. See Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-10(a); Age Discrimination in Employment Act, 29 U.S.C. § 627; Occupational Safety & Health Act, 29 U.S.C. § 657(c). Since that time, a number of other labor statutes have been passed that have required the posting of notices. See Employee Polygraph Protection Act, 29 U.S.C. § 2003; Americans with Disabilities Act, 42 U.S.C. § 12115; Family and Medical Leave Act, 29 U.S.C. § 2619(a). Even more tellingly, on at least one

occasion, Congress has amended a labor law to impose a notice-posting requirement. See Veterans' Benefits Improvement Act of 2004, Pub. L. No. 108-454, § 203, 118 Stat. 3606 (2004) (codified as amended at 38 U.S.C. § 4334).

The contrast between the roles the NLRA sets forth for the NLRB and those that other federal labor statutes prescribe for those of its sister agencies with notice-posting authority is of particular significance. As we have discussed, the Board's core functions are reactive ones. In contrast, other agencies that have promulgated notice-posting requirements have proactive mandates. For instance, the EEOC, which is granted the authority to require the posting of notices, 29 U.S.C. § 627; 42 U.S.C. § 2000e-10(a); 42 U.S.C. § 12115, has the power to proactively file charges and undertake investigations, regardless of whether a party files a charge, 42 U.S.C. §§ 2000e-5(b), 2000e-8(a). The same is true of the Occupational Safety & Health Administration, see 29 U.S.C. §§ 657, 659, as well as the Department of Labor ("DOL") more generally, see, e.g., 29 U.S.C. §§ 211(a), 216(c), 217, 2005, 2616, 2617.[14]

---

[14] The Board compares the challenged rule to a DOL notice-posting requirement, which it enacted under the Fair Labor Standards Act ("FLSA"), despite that statute's silence as to notice-posting. The Board points us to no authority analyzing whether that statute grants the DOL authority to enact a notice-posting requirement, and we do not address that issue here. We do note that requiring universal employer notice-posting is more
(Continued)

34

Congress's continued exclusion of a notice-posting requirement from the NLRA, concomitant with its granting of such authority to other agencies, can fairly be considered deliberate. See Brown & Williamson, 529 U.S. at 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."). Had Congress intended to grant the NLRB the power to require the posting of employee rights notices, it could have amended the NLRA to do so.

---

congruous with the DOL's proactive roles in enforcing the FLSA than it is with the NLRB's reactive roles. Unlike the NLRB, the DOL has the ability under the FLSA to proactively conduct investigations and file enforcement actions. 29 U.S.C. §§ 211(a), 216(c), 217; see DOL, Enforcement Under the Fair Labor Standards Act, http://www.dol.gov/elaws/esa/flsa/screen74.asp (last visited May 31, 2013). Furthermore, in enacting its notice-posting rule, the DOL was acting pursuant to an enabling statute distinct in relevant respects from the NLRA. In particular, the FLSA included a recordkeeping requirement, 29 U.S.C. § 211(c), and the DOL promulgated its notice-posting regulation under its authority to enforce that provision, see 29 C.F.R. § 516.4.

35

III.

For the foregoing reasons,[15] the judgment of the district court is

AFFIRMED.

---

[15] Having determined under <u>Chevron</u>'s first step that the NLRA unambiguously does not grant authority to the NLRB to promulgate the challenged rule, our analysis ends, and we do not proceed to <u>Chevron</u>'s second step.